## KISER v. HOT SPRINGS BARYTES CO.

(Filed December 20, 1902.)

PLEADINGS—*Complaint—Answer—Allegata—Probata—Negligence.*

In this case the evidence offered by the plaintiff does not sustain the allegations of the complaint as to the negligence of the defendant.

Clark and Douglas, J.J., dissenting.

Action by Thomas A. Kiser, by his guardian, against the Hot Springs Barytes Company, heard by Judge *W. B. Councill* and a jury, at August Term, 1902, of the Superior Court of Madison County.

"The plaintiff above named complains of the defendant and alleges:

"First, for a first cause of action—

"1. That this plaintiff is an infant under the age of twenty-one years.

"2. That on the 6th of January, 1900, upon application duly made in his behalf, the above named J. A. Kiser was duly appointed by the Clerk of the Superior Court in and for the county and State aforesaid the guardian of said plaintiff, and thereupon duly qualified as such guardian.

"3. That the defendant is a corporation duly organized and existing under and by virtue of the laws of the State of New York, and was, on and prior to the 19th day of April, 1899, engaged in the manufacture of barytes, staves and barrels at Hot Springs, in the county of Madison, and State of North Carolina.

"4. That on or about the 1st day of January, 1897, J. A. Kiser, father of this plaintiff, entered into a contract with the said defendant company, by which it was agreed that this plaintiff was to enter the employment of the said defendant and operate for it the said dryer in said defendant company's works, a position in which no special skill or knowledge of

machinery was required, and it was expressly stipulated by
the said J. A. Kiser, and agreed to by the said defendant,
that this plaintiff should not be required to work in any
department of the said defendant company's establishment
where there was danger of receiving injury from the opera-
tion of the machinery, the said J. A. Kiser stating to the
said defendant company that this plaintiff was unskilled in
the use of machinery and ignorant of the dangers attending
its operations.

"5. That in compliance with said contract and agreement,
this plaintiff at once entered into the employment of the said
defendant company and operated for it the said dryer until
on or about the 19th day of April, 1899.

"6. That this plaintiff is now, and was at the time he re-
ceived the injuries hereinafter named, unskilled in the use
of machinery of any kind, and almost wholly ignorant of the
dangers attending the operation of the same, and especially so
of the machine in the cooper shop of said defendant com-
pany's establishment, known as the planer, which fact, as this
plaintiff is informed and believes, was well known to said
defendant.

"7. That on and prior to the 19th day of April, 1899, the
said defendant company kept in the cooper shop of its estab-
lishment a certain machine, known as a planer, used in the
manufacture of staves, barrels, etc., and, as this plaintiff is
informed and believes, the said defendant company care-
lessly and negligently failed to provide proper appliances to
insure the safety of its employees in operating said machine,
and so carelessly and negligently kept and maintained said
machine, that it became clogged and out of repair to such an
extent that the operation of the same was attended by much
danger, which fact, as this plaintiff is informed and believes,
was well known to said defendant.

"8. That on the said 19th day of April, 1899, the said
defendant company, well knowing that it had failed to pro-

vide proper appliances to insure the safety of its employees, and that said planer was clogged, defective and out of repair, and that this plaintiff was unskilled in the use and ignorant of the danger attending its operation, carelessly and negligently removed this plaintiff from the drying department of its said establishment, and carelessly and negligently ordered and commanded (him) to assist in the operation of said planer, and carelessly and negligently failed to inform him of the defective and dangerous condition of said machine, or to instruct him in its use.

"9. That this plaintiff, being ignorant of the defective and dangerous condition of said machinery, and of the dangers attending its operation, and well knowing that if he refused to obey the commands of said defendant he would be discharged, began work, as ordered, at said planer, and while so engaged on the 19th day of April, 1899, his right hand became entangled in said machine, and all of the fingers and part of the thumb of said hand were cut off, thereby causing said plaintiff much pain and mutilating and disfiguring his said hand, and permanently disabling him from performing manual labor, to his great damage in the sum of nineteen hundred and ninety-nine dollars.

"First, for a second cause of action—

"1. That this plaintiff is an infant under the age of twenty-one years.

"2. That on the 6th day of January, 1900, upon application duly made in his behalf, the above-named J. A. Kiser was duly appointed, by the Clerk of the Superior Court in and for the county and State aforesaid, the guardian of said plaintiff, and thereupon duly qualified as such guardian.

"3. That the defendant is a corporation duly organized and existing under and by virtue of the laws of the State of New York, and was, on and prior to the 19th day of April, 1899, engaged in the manufacture of barytes, staves and

barrels at Hot Springs, in the county of Madison, and State
of North Carolina.

"4. That on or about the 1st day of January, 1897, J. A.
Kiser, father of this plaintiff, entered into a contract with
the said defendant company, by which it was agreed that
this plaintiff was to enter the employment of the said defend-
ant and operate for it the said dryer in said defendant com-
pany's works, a position in which no special skill or knowl-
edge of machinery was required, and which was not attended
by any danger to this plaintiff, and it was expressly stipulated
by said J. A. Kiser, and agreed to by said defendant, that
this plaintiff should not be required to work in any depart-
ment of the said defendant company's establishment where
there was danger of receiving injury from the operation of
the machinery, the said J. A. Kiser stating to the said de-
fendant company that this plaintiff was unskilled in the use
of machinery and ignorant of the dangers attending its oper-
ations.

"5. That in compliance with said contract and agreement,
this plaintiff at once entered the employment of said defend-
ant, and so continued, as he was under contract to do, opera-
ting its said dryer, until on or about the 19th day of April,
1899.

"6. That on the said 19th day of April, 1899, the said de-
fendant company, contrary to and in violation of its express
contract and agreement, removed this plaintiff from the said
drying department and ordered and commanded him to assist
in operating a certain machine known as a planer, in the
cooper shop of said establishment, the operation of said planer
being attended with much danger to a new and unskilled
workman, as this plaintiff then was, as was well known to
said defendant company.

"7. That on said 19th day of April, 1899, while this plain-
tiff was engaged in operating said planer in obedience to the
orders of the said defendant company, his right hand became

entangled in the machinery, and all of the fingers and part of the thumb of said hand were cut off, thereby rendering said hand useless.

"8. That by reason of the injuries received by the plaintiff as aforesaid, in consequence of the wilful violation of the contract and agreement entered into by the said J. A. Kiser and the said defendant as aforesaid, the plaintiff suffered much pain, and his said hand was mutilated and disfigured to such an extent as to permanently disable him from performing manual labor, to his great damage in the sum of nineteen hundred and ninety-nine dollars.

### "RELIEF.

"Whereupon, the plaintiff prays for judgment against the defendant for the sum of $1,999, and the costs of this action, to be taxed by the Clerk.

### "EVIDENCE OF J. A. KISER.

"The plaintiff, in support of the issues submitted to the jury by the Court, introduced as a witness J. A. Kiser, who testified as follows:

"I am guardian of Thomas Kiser; he is my son; lived at Hot Springs at time I brought this action; my son was born December 24, 1870; was hurt April, 1899; I hired him to defendant in 1897; one Doherty was then manager of the defendant company; I had an understanding and agreement with the company, through Mr. Doherty, that my son was not to work where there would be any danger from working with machinery, and where it would require skill in operating machinery; after hiring him to Doherty, he worked at the dryer, and continued to do so while Doherty remained with the company; after this, my son was, without my consent or knowledge, moved from the dryer to the cooper shop, where

he was injured; fingers of his right hand were cut off by the knives of the planer; I went to the planer and found the shavings banked up around it, and found Thomas' fingers on top of the shavings at the planer; a hood could have been put over or in front of the knives—a suction appliance could have taken the shavings out of the room; modern machinery is supplied with this appliance; took the boy home; it was thirteen months before he could do manual work; can work some since; makes about half a hand; expenses during sickness about $100, and doctor bills about $50; boy suffered very much from his wounds; I have lost his services from the accident to the time he was of age; during the time he worked prior to his majority, his earnings came to me and family.

### "CROSS-EXAMINATION.

"On cross-examination, he said:

"Never had any contract with any one but Mr. John Doherty about how my son was to be worked; contract with Doherty on or about January, 1897, as near as I can recall; contract was, my son was not to be put anywhere where skill was required; no doubt about this; do not know that the word 'skill' was used, but he was not to be put anywhere where there was any danger of being hurt; I knew the concern changed hands; my son continued to work after the change; I made no contract except with Doherty; son got seventy-five to eighty cents under him; after the change got little more, eighty-five to eighty-seven cents; room where son was hurt was about 40 by 100 feet; machinery in there of different kinds; I never worked at machinery of this kind; my son was off-bearer from the machine; do not know who put him to bear off lumber; he said Mr. Terry sent him to work in cooper shop—said he did work up there, working before his injury some; said Mr. Sowers went to the other end of the

machine and he went to off-bearing; I stated in complaint that the machine was out of repair because it was clogged and there was no means of taking the shavings provided; if anything was the matter with the machine itself, I did not know it; plank sometimes hung in planing mill; I have seen this; it is my observation that this sometimes occurs at the planer; have no personal knowledge about different kinds of machinery in the shop; my son is an ordinarily intelligent young man; can read and write and cypher, and is not suspected of not being sensible and intelligent; he learns things quickly; he lays brick some, not an expert; do not know what he got as wages all the time; says he got twenty to twenty-five cents per hour at Johnson City; if not injured, he could make one dollar per day; I allowed him to keep a part of his wages before he was of age, when he wanted to.

"EVIDENCE OF WILLIAM KISER.

"Plaintiff then introduced William Kiser, who testified as follows:

"I am brother of Thomas, and son of J. A. Kiser; I was employed by defendant at time Thomas was injured; Mr. Terry wanted thirty-two barrels made on this day, and I went to him for help; he said he did not have help to spare; I told him I would have to have help if I got through; he then said he could spare Thomas from the dryer, and I said I could use him, and would like to have another man who had worked in the barrel factory; I went back up in the cooper shop, and commenced to work on the crozier; I told him I wanted somebody else who understood the machinery in shop; I went up and started up the crozier, a machine for cutting grooves in heads for barrels; Thomas came up, and he and Will Sowers went to the planer and commenced work; Thomas was 'off-bearer'; I started back to show him about the

machine; I knew Thomas did not know anything about it, and as I started towards him he jumped back, and I knew he was cut; shavings were piled up about the machine so he could not see the knives if he had known they were there; I had been trying several days to get the shaving bin cleaned out below so I could move the shavings out of the way; I had told Mr. Terry to do this; the planing machine had two sets of knives, the front knives being on top and the rear knives under the machine; the shaving bin was full of shavings; there was a hood or protector in front of entrance to machine; none over the rear knives of the machine; a hood or protection could have been put over the rear knives; it would have saved somebody from getting hurt; when I went to the machine after my brother was hurt, a board was in the machine and shavings were clogged up on the bar that held the plank down on the knife, and the plank could not go through; the shavings cut by the top knives fall over the under knives; I know of other machines that have fans and suction pipes to take shavings away; if this machine had had such appliances, it would not have clogged, as shavings would have been carried away; I have worked at one planing machine that had pipes to carry shavings away; the hole where the shavings went through from this planer was about five feet from the planer; there was a rake somewhere in the shop, but it could not have been used that day as there was no place to move them; the order was to make thirty-two barrels that day; had to first dress the lumber; I never gave Thomas any instruction about running the machinery in the shop; Mr. Terry did not do so that I know of; Thomas had worked at the other end of the machine on the day before; he had also worked up there setting up barrels some; if I had had another hand on the day he was hurt I could have used Thomas to set up laths.

"CROSS-EXAMINATION.

"On cross-examination, he testified:

"I had some material from day before to use the crozier upon; brother had worked in the shop, setting up barrels; I told Terry I could use my brother in setting up barrels; I then went up to the shop, and my brother came up afterwards; I knew my brother did not know how to use the planing machine; I did not put him to work on the machine the day he was hurt; I do not know how my brother came to run the planer the day before he was hurt; the machine can be run with one set of knives at a time; this machine had been operated in its condition about five years; way to take shavings from machine was to use a rake; sometimes with a scoop; never saw any one use his hands; machine was clogged with shavings when I saw it, after Thomas was hurt; it sometimes was stopped by plank; the rear knives back from the rear of the machine were about six to eight inches from the rear end of the machine; the shavings had accumulated for several days, and I knew they were there; Thomas would be obliged to see the shavings at the machine when he began to work as off-bearer; he did not have to take the plank until it came through or by both knives; I might have worked at the planer the evening after my brother was hurt; I told Mr. Sowers to take charge of the machine and run it; I had no talk with my brother previous to his injury, at the machine where he got hurt; I would rather plane dry lumber than green; when plank was not coming through, could see the near knives, or could see them by stooping down and looking under; Thomas had seen plank put in the planer, and seen it come out, many times; boys like to watch machinery at work; the Dohertys were first in charge of shop and property of defendants; it was afterwards turned over to Terry; Terry told me he wanted me to keep right on at work, raised my wages from

$1 to $1.25; it was about a month after the change from Dohertys to Terry that work shut down; Tom drew his pay and receipted for it; I did not hear the contract between my father and the Dohertys; never had any talk about Tom that I remember with Mr. Terry; never asked Mr. Terry to take Tom to work; I agreed with Mr. Terry that Tom was to work in the shop setting up barrels; there would not have been any danger in his using the 'borer,' or driving hoops, or setting up barrels; the hole in the floor was used for all shavings and borings from all the machinery in the shop; so used for five years; planer I saw at the other place I worked was not like the one where Tom was hurt; I worked on about a year after Tom got hurt; the only defects I knew of in the machine was the lack of a protection to rear knives, and the shavings piled up about the machine, and the hole five feet from the machine; machine itself was all right with these exceptions.

"EVIDENCE OF THOMAS KISER.

"Thomas Kiser, the injured party, then went upon the witness stand and testified as follows:

"I am 22 years old now; was injured in April, 1899; was hurt while at work at a planing machine in defendant's cooper shop; I was working for defendant; had been working at the dryer most of the time; the day previous to my injuries worked in cooper shop some; Mr. Terry sent me up there to work; told me to go up and help them in the barrel factory; I went up and helped plane lumber; fed the planer on that evening; Mr. Sowers bore off, or worked at the other end of the machine a couple or three hours; next morning I began work at the dryer; Mr. Terry came and told me to go up in shop and help make some barrels; I went up, and Mr. Sowers and myself began to run the planer; Sowers took front end of

planer, and I took the rear; in a few minutes I was hurt; was injured while trying to get the shavings out of the way, so the plank would come through the machine; I tried to knock the shavings away, and my hand was cut while doing so; I had no instructions prior to this time about operating this machine; I could not see the knives that cut my hand, the shavings were in the way, and besides, I could not see them without getting down and looking under; I did not know exactly where the knives were; knew there were knives; there was a rake in the mill, but could not be used to any advantage, because shavings were so piled up. (Witness here describes how he used his hand when fingers were cut off.) Was sick that evening; not much sick after that; suffered with the wound for four months; was twelve months before I could do any work of any account; I can not earn as much as if I had not been injured; could earn one dollar per day more if I had my hand; my injury does not affect my mind much: I have studied a good deal about losing my hand. (Here witness's evidence was read over to him, and he said it was correct.)

"CROSS-EXAMINATION.

"On cross-examination, he testified:

"That he had told all that had occurred between him and Mr. Terry about going up into the shop, and then proceeded; the first evening I went to shop to work, I just went to work on the machine; no one told me to do so, that I remember; machine was running when I went up; it was the first time I ever fed that evening, and Mr. Sowers bore off; I saw him getting shavings out of the way; he might have used a scoop; I could not have used one the day after this; would not have been of any use, I know; I knew there were knives under the machine somewhere; I did not look to see where they were; I saw the machine was choking up, and saw something had to

be done at once; I could not have seen the knives any way for the accumulation of shavings; I knew knives were under the machine, because both sides of the plank were dressed; I was not told by any one to keep the shavings away from the machine where I was at work; I was sent up to help make barrels, and that was the first thing I saw that needed to be done; I saw that there was no lumber planed, and that Mr. Sowers was back there; I could see that there was no lumber planed when I went up, and that is why I went to work at the planer; my brother did not tell me to go to the planer, and Terry did not tell me anything, only to go up to the factory and help make barrels; I never had any order from any one to work at this particular machine; I never talked to my brother or Mr. Terry about any machine in the cooper shop; I can't be mistaken about this; I do not remember that Mr. Terry was in the factory that day, or the evening before; I did not go to the machine voluntarily and commence work exactly; I was sent up by Mr. Terry, and told to help make barrels, and when I got up there, went to work on the planer; Terry paid me 87 cents, and Doherty 75 cents per day; I was working at the mill when it was sold, and after sale was off two or three months; I then went back and commenced work for Mr. Terry; I engaged to work for him myself; first work was unloading ore off railroad cars; this lasted a day or two; I made no special contract to run the dryer; I also broke up rock sometimes and wheel-barrowed them in; and also fed elevator some; I used some of the money I earned at home, and the rest myself; father had control of my money; has asked me to turn it over to him.

"Plaintiff put in evidence the summons, dated January 6, 1900, and rested his case.

### "WILLIAM KISER, RECALLED.

"The plaintiff then recalled William Kiser, who testified

that the planer was second-hand one; that there was no dressed lumber over from the evening before, except a small amount; that he was foreman of the shop, and generally put the men to work. But sometimes they would come up and go to work at something they saw was needed.

### "THOMAS KISER, RECALLED.

"Thomas Kiser was then recalled, and said that he knew his brother was the foreman of the barrel shop.

"The plaintiff then closed his case."

From a judgment for the plaintiff, the defendant appealed.

*Gudger & McElroy,* and *C. B. Mashburn,* for the plaintiff.
*Merrimon & Merrimon,* for the defendant.

MONTGOMERY, J. The plaintiff in a civil action is required to set out in his complaint a plain and concise statement of the facts which constitute his cause of action. On the trial, he must make good his allegations by competent evidence. The defendant is supposed to state in his answer his defense to the allegations of the complaint, and to be prepared at the trial with evidence to make good his defence. It seems to us, from a careful reading of the complaint, that the plaintiff offered no evidence to sustain his allegations. The plaintiff, a young man nineteen years of age, in the original complaint alleged that he was employed by the defendant company in January, 1897, to operate what is known as the dryer in the defendant's business of manufacturing lumber, and that he continued in that line of work until the 19th of April, 1899, when he was transferred, by the order of the superintendent, to work on the planer in the cooper shop of said defendant's works; that the machinery was dangerous, and that he was ignorant of the dangers attending the opera-

tion of the machinery he was put to work upon; and that the defendant company "grossly and carelessly neglected to inform him of the danger connected with the operations of said planer, and carelessly and negligently permitted the said Thomas A. Kiser to attempt to run and operate said. machinery, as he had been ordered to do as aforesaid, without instructing him in regard to the correct manner in which the said machinery should be operated and managed." He further alleged in the complaint that on account of the said negligence of the defendant, he, while attempting to carry out the instructions of his employer, received a severe and dangerous wound in his hand, to his great damage. In the complaint there was the further allegation that the defendant had permitted, carelessly and negligently, the planer to become encumbered and choked with shavings, so that it concealed from view the knives of the planer and impeded its operation, and that while in that condition the defendant, through its superintendent, ordered the plaintiff to aid in its operation, and negligently failed to instruct the plaintiff in the manner of operating the machinery, and to point out its dangers.

And further, that the plaintiff was ignorant of the manner of operating the planer, and unable to see the dangerous parts of the machine, on account of the accumulation of shavings, and that the plaintiff received his injury through the negligent failure of the company to instruct him and inform him in the operation of the machinery, and in negligently failing to point out its dangers. Afterwards, the plaintiff filed another complaint, with two causes of action, the first of which contained the same allegations as were set forth in the original, but with the addition that the father of the plaintiff made the contract with the defendant company for the employment of his son, the plaintiff, and that it was expressly stated at the time of the contract of employment that

the plaintiff should not be required to work in any department of the said defendant company's establishment where there was danger of receiving injury from the operation of the machinery; that under that agreement and contract, the plaintiff entered the service of the defendant and operated the dryer until the 19th of April, 1899, when he was transferred to the cooper shop to work on the planer, and received the injury of which he complained. The second cause of action was for damage for a violation of the contract of employment, the breach complained of being the transferring of the plaintiff to the work on the planer from his work at the dryer.

All of the evidence tended to show that the plaintiff was not put to the work of manipulating or operating the planer, but was engaged in bearing off to a convenient place the dressed lumber as it came from the machine. In fact, it does not appear clearly that the plaintiff was directed to work at the machine. In his own testimony he says: "I went up to help make barrels, and that (getting out some timber with which to make the barrels) was the first thing I saw that needed to be done. I saw that there was no lumber planed, and that Mr. Sowers was back there. I could see that there was no lumber planed when I went up, and that is why I went to work at the planer. My brother did not tell me to go to the planer, and Terry did not tell me anything, only to go up to the factory and help make barrels. I never had any order from any one to work at this particular machine. I never talked to my brother or Terry about any machine in the cooper shop. I can't be mistaken about this. I do not remember that Terry was in the factory that day, or the evening before. I did not go to the machine voluntarily and commence work exactly."

His own testimony showed that no instructions about the dangerous character of the machine was necessary. He knew the knives were there, and that they were dangerous.

It would have been of no service to him to have been told by the company's superintendent to be careful and not to come in contact with the knives. This is not a case like that of *Sims v. Lindsay,* 122 N. C., 678, where the plaintiff, a young girl wholly inexperienced, and not having been intrusted in the care of the machine, on being required by her employer to operate with her hands an ironing machine, which was dangerous in its construction and operation, was injured in the performance of her work. As to the allegations that the contract was made with the defendant by the father of the plaintiff, the proof was all the other way. The father testified that the contract he made was with another operator of the machinery, a man by the name of Doherty, although, as we have already stated, it had been alleged in the complaint that he had made the contract with the present defendant. His exact language was as follows: "Never had any contract with any one but Doherty about how my son was to be worked; contract with Doherty on or about January, 1897, as near as I can recall; contract was, my son was not to be put anywhere where skill was required; no doubt about this; do not know that the word 'skill' was used, but he was not to be put anywhere where there was any danger of being hurt; I knew the concern changed hands; my son continued to work after the change; I made no contract except with Doherty; son got 75 cents or 80 cents under him; after the change got little more, 85 cents to 87 cents." On that point, the plaintiff testified as follows: "Terry paid me 87 cents, and Doherty 75 cents per day; I was working at the mill when it was sold, and after sale was off two or three months; I then went back and commenced work for Terry; I engaged to work for him myself; first work was unloading ore off of railroad cars; this lasted a day or two; I made no special contract to run the dryer." Terry said, "When I took charge as manager, I found William Kiser there, and continued him in his work.

I employed Thomas Kiser, the plaintiff, at the instance of his father and brother William. Both asked me to give him work; think William told me Tom had worked at the mill before; won't be positive; Tom was not employed for any specific work."

The plaintiff and the manager of the company at that time, months after Doherty had ceased to control and the business had been discontinued, both agreed that the contract was made by and between them, the father not being privy to it. This view of the case makes it unnecessary to discuss the question as to the defendant being negligent, or whether the plaintiff contributed to his own injury, so ably argued by the counsel. There was no evidence going to support the allegations of the complaint, and judgment as of nonsuit ought to have been entered against the plaintiff, agreeably to defendant's motion.

Error.

CLARK, J., dissenting. The complaint alleges that the plaintiff, a minor at the time of the injury, was employed by the defendant under a contract with his father; that he was "to operate the dryer, a position in which no special skill or knowledge of machinery was required," and that it was expressly agreed "that the plaintiff should not be required to work in any department   *   *   *   where there was danger of receiving injury from the operation of machinery, * * * the defendant being informed that he was unskilled in the use of machinery and ignorant of the dangers attending its operations." That the defendant had a planer which it failed to provide with proper appliances to insure the safety of its employees, which was also defective and out of repair, so that it became clogged, and that the defendant negligently ordered the plaintiff to assist in operating said planer, and negligently failed to inform him of its defective and danger-

ous condition, or to instruct him in its use, and plaintiff being ignorant thereof, and of the dangers attending its operation, and knowing if he refused to obey he would be discharged, began work at said planer when ordered, and his right hand becoming caught in the machine, all the fingers and part of the thumb were cut off, permanently disabling the plaintiff. This is the substance, somewhat condensed, of the complaint.

J. A. Kiser, the plaintiff's father, testified that his contract was that his son was not to work where there was any danger from machinery, and that his son was moved without his knowledge or consent and put to work in cooper shop, where his fingers were cut off by the knives of the planer.

William Kiser testified that he was ordered by Superintendent Terry to make thirty-two barrels that day, and asked for more help, and two men were sent him and commenced work, one of them the plaintiff; that he knew the plaintiff did not know anything about the machine, and he started to him to show him about the machine, but the plaintiff was cut before he got there; that shavings were piled about the machine so that plaintiff could not have seen the knives if he had known they were there; that he had been trying for several days to get the shavings moved out of the way, and had told Superintendent Terry this ought to be done; that there was a protector or hood over the knives in front, but none over the rear knives, and if there had been, it would have prevented any one getting hurt; that the shavings cut by the front knives fall over the under knives; that if this machine had had the same appliances that are on other planers, he knows that it would not have clogged.

The plaintiff testified that he had been working at the dryer; that Terry ordered him to go up and help in the barrel factory; that he was injured while trying to get the shavings out of the way so the plank would come through the ma-

chine; that he tried to knock the shavings away, and his hand was cut while doing this; that he had no instructions prior thereto about operating this machine; that he could not see the knives which cut his hand, the shavings being in the way, besides he could not see them without getting down and looking; that there was a rake in the mill, but it could not be used to any advantage, because the shavings were piled up.

W. H. Sowers, witness for the defendant, said on cross-examination that he did not see the rake there that morning, it may have been covered up in the shavings; that this was a dangerous piece of machinery for an inexperienced man to work at without instructions, and he does not know of any instructions being given to the plaintiff as to this machine; that the accumulation of shavings would have something to do with preventing a party from seeing the danger of the machine; that the evening before the accident he heard William Kiser tell Terry that a good many shavings had accumulated, and he would like to have them removed; that the accumulation of shavings increased the danger of all who came around the planer; that when the plaintiff was injured the shavings were piled up all around the planer two or three feet deep, except where the feeder and off-bearer stood, some four feet away; that this machine was not one with modern appliances, or it would not have been necessary to rake the shavings from it; that these modern appliances take away the shavings by suction, and also protect the hands from exposure to the knives; that such modern appliances have been in use to his knowledge six or eight years; that the plaintiff, prior to the evening before, had never worked in the shop. This was in cross-examination of one of the defendant's witnesses. There was other evidence for the plaintiff, and evidence in contradiction by the defendant, but on a motion to nonsuit, it is only necessary to consider if there is any evidence tending to show negligence; if so, its weight is for the jury.

There is both allegation and evidence, as above appears, that the defendant agreed that the plaintiff would not be put to work at dangerous machinery; that the plaintiff, a minor, was inexperienced and unaware of the danger attendant upon a planer, which the defendant's witness says was a dangerous machine for an inexperienced worker, and that suddenly, in violation of the contract, the defendant's superintendent ordered the plaintiff to work at said machine, without giving him any instructions, and when the machine was clogged by shavings, concealing the knives underneath, which, besides, had no guards upon them; that the machine was unprovided with modern appliances, which the defendant's witness stated had been in use to his knowledge six or eight years, and which he says would have prevented any accumulation of shavings, and have also protected the plaintiff's hands; the same witness further said he saw no rake there that evening, and it may have been covered up in the shavings, which were piled up two or three feet deep all around the planer. This was certainly testimony tending to prove negligence, which the Judge properly submitted to the jury. That under these circumstances, not seeing the knives underneath, and seeing guards on the knives above, and being wholly uninstructed as to this machine, which was entirely new to him, and seeing no rake around, the plaintiff should have attempted to clear the shavings away with his hands, the only method he knew, does not present such a state of facts that the Court can declare, as a matter of law, that the defendant's allegation of contributory negligence was proved. Contributory negligence is an affirmative defence, and if there is no evidence, the jury must answer it "No." *Sims v. Lindsay*, 122 N. C., 678. Here, there being conflicting evidence, the jury answered that issue "No," and the first issue "Yes," and if there was any error in such responses, it was not an error of law but an error of fact, and hence not reviewable on appeal.

In *Turner v. Lumber Co.,* 119 N. C., at page 399, this Court said: "If the plaintiff was inexperienced in the use of machinery, and the knives were so arranged as to make them a hidden danger, such a danger is not to be obvious to inspection, then, if the defendant, by the use of ordinary care, could have foreseen the happening of the accident, it became its duty either to provide an adequate protection against the knives, or to give the plaintiff proper warning of the danger." Here, it did neither.

Among many similar cases that can be cited are *Myers v. Lumber Co.,* 129 N. C., 252, where shavings were allowed to accumulate and the plaintiff slipped and fell against a saw running naked without a guard; also *Dorsett v. Mfg. Co.,* at this term, in which the plaintiff was caught in cog wheels revolving near him. In both these cases, and many others similar, it was held that the question of negligence was for the jury. This is a far stronger case, for in neither of the above two cases was the plaintiff young and inexperienced, nor put to work at a dangerous machine without instructions, and contrary to his father's contract, which was that he should not be exposed to such risks.

The other exceptions are without merit, and require no discussion.

DOUGLAS, J., concurs in the dissenting opinion.